# U.

## Case No. 14,321a.

### UDELL v. The OHIO.

[18 Betts, D. C. MS. 90.]

District Court, S. D. New York. March 27, 1851.[1]

MARITIME LIENS — NEW YORK LIEN LAW — SUBCONTRACTOR—MATERIAL FURNISHED—OWNERSHIP OF BUILDING VESSEL.

[A vessel is built under a contract which names the persons for whom to be built as owners, and further provides that payment is to be made monthly, as the building progresses, to the builders. The builders are paid in full, and the vessel launched. Subsequently a furnisher of material libels the vessel, and claims a lien under the New York law (2 Rev. St. p. 423, § 1), upon the ground that the builder was, for the purposes of the statute, the owner of the vessel until finished. Held, that the builder had no such interest in the vessel, as against the owners thereof, as could be subject to the lien of the libellants.]

[This was a libel by James Udell to recover for supplies furnished the steamship Ohio; George Law and others, claimants.]

BETTS, District Judge. This case is of considerable importance because of the amount involved, but more so in respect to the question of extent to which the privilege of material men for liens upon vessels may be carried under the state statute. It was argued orally before the court, with great minuteness, and the counsel for the libellants have since furnished written points expounding the argument, and criticising the cases referred to as having application to the subject.

I lay out of view the claim that the libellants here have a privilege or lien by the general maritime law, independent of that provided by the state statute. I regard it as definitely settled that in respect to domestic vessels a material man must look to the local law alone as the source and measure of his lien upon the vessel. [The General Smith] 4 Wheat. [17 U. S.] 438; [Peyroux v. Howard] 7 Pet. [32 U. S.] 341; The Chusan [Case. No. 2,717]; Hull of a New Ship [Id. 6,859]; The Phebe [Id. 11,065].

The local statutes will be enforced in the

---

[1] [Affirmed in Case No. 14,322.]

United States courts in appropriate cases according to their effect in the state where enacted, and consequently the expositions of the state tribunals are to be received as the highest evidence of their design and import. Elandorf v. Taylor, 10 Wheat. [23 U. S.] 152; Shelby v. Gray, 11 Wheat. [24 U. S.] 361; U. S. v. Morrison, 4 Pet. [29 U. S.] 127; Green v. Neel, 6 Pet. [31 U. S.] 291. Not only is this principle observed as to the construction of statutes already declared by the state courts, but the United States courts so far defer to that interpretation of the law as to repudiate decisions of their own when the state courts subsequently put a different construction upon local statutes. The United States circuit court in Virginia decided that an elegit could not issue against real estate until the remedy on a fieri facias against personal property had been exhausted, and that the lien was suspended during the running of that process. A case soon after arose in the court of appeals of Virginia, in which it was decided that the right to take out an elegit is not suspended by suing out a writ of fieri facias, and that consequently the lien of the judgment continued pending the proceedings on that writ. Upon the ground that the judgment of the state court on the import of the state law supplied the rule of decision to the United States court, the decision of the circuit court, although made anterior to that of the court of appeals, was reversed. U. S. v. Morrison, 4 Pet. [29 U. S.] 124. The same doctrine was declared in the circuit court of this district. A construction was put upon the existing statute of limitations of the state. . Dorr v. Swartwout [Case No. 4,010]. On the appearance of the report of the case of Burroughs v. Bloomer, 5 Denio, 532, in which the supreme court of the state adopted a contrary construction of the statute, it was declared by the court to the bar that the latter decision would be followed in the United States courts in this district as the proper construction of the statute. It, however, appearing that about simultaneously with the decision in Burroughs v. Bloomer another branch of the supreme court created by the new constitution, and of co-ordinate power with the old supreme court, had expounded the statute in the same sense as the United States circuit court, that decision has not been revoked. Cole v. Jessup, 2 Barb. 309.

The admiralty courts have manifested a disposition to give a liberal effect to state statutes providing a lien to material men and mechanics for supplies and services rendered to domestic vessels, and one most beneficial to the interests of that class of creditors. The laws have been regarded remedial as to those interests, and thus entitled to a benignant interpretation. Many cases have occurred in this court where the influence of that principle has had great weight in controlling the decision, such as protecting those classes of creditors against the loss of their liens from surreptitious removals of the vessel out of the state or from the port, or where they left the port, not on a business employment, but to test the sufficiency, or proper arrangement of the machinery, or other parts of the vessel.

In the case of Force v. The Nathaniel P. Tallmadge, brought before this court in October, 1836, the leading points in controversy in the present cause were raised and considered.[2] No detailed opinion was delivered in writing by the court, but the final order entered, compared with the proofs and points discussed before the court, indicates distinctly the view taken of the statute and the interpretation put upon it by the court. Tooker & Haight, as ship builders, in August, 1835, contracted with the Dutchess Whaling Company to build a ship for them. She was commenced in June, 1836, and then delivered to the company. The company had then advanced from $2,000 to $3,000 on her, and were owing the builders $750 on the contract. The builders were insolvent, and were at the time indebted to the company $4,500 on a judgment. The company employed an agent to superintend the building of the ship. Tooker & Haight kept a ship yard where general work in their line was done, and they purchased on credit from time to time materials adapted to their business, which were kept in their yard. In the winter of 1835–36, Tooker & Haight also commenced building a schooner in their yard, and applied to her from time to time materials on hand, including some of those furnished by the libellants. Some of the same materials also went into another ship they were repairing at the yard. The libellants had previously furnished brass work, nails, spikes, &c., to Tooker & Haight, on credit for their business. The old account with them was settled in June, 1835, and a new account opened at 90 days' credit. They said they were about building a ship, and wanted these articles for her. The articles in question were sold him at 90 days' credit, and, the libellant proved, were used in the ship to the amount decreed in his favor. A bill was drawn by the libellant on Tooker & Haight for account since 1835, and accepted by them, but not paid. The court first rehearsed that the materials used and applied in the ship having been furnished by the libellant, and not having been paid for, and no exclusive personal credit having been given the builders therefor, and there being no waiver direct or implied on the part of the libellant of the lien on the vessel therefor, and that consequently, by the law of this state, the price contracted for continues a lien on the ship, decreed that the libellant recover for the various supplies (as detailed), with interest.

The only noticeable distinctions between the main features of that case and the present are that the Whaling Company had an agent superintending in their behalf the building of the ship, although it does not appear he directly sanctioned this purchase or exercised any claim of ownership or possession or

agency over the ship itself, until after she was launched, and that the full amounts due the builders had not been paid them by the company when the ship was launched, and went formally into their possession. Still, it was equally obvious in that case and in this that the credit was directly to Tooker & Haight, and that their personal responsibility was relied upon at the time, although there was no express interpretation to that effect, and also that the materials were furnished on a general purchase, and not delivered specifically for the use of the ship Nathaniel P. Tallmadge. The ground upon which the court obviously proceeded in the judgment was that Tooker & Haight were to be regarded as owners of the ship pro hac vice at least, as they had not merely a right of possession in the character of bailees for labor, but were owners of the materials put in her not then paid for, or might be regarded as acting under the approval of the agent and superintendent in buying materials for her, and that a liberal construction of the statute of the state should seize upon every such consideration to uphold the equities of a material man whose property had gone into her construction. Merritt v. Johnson, 7 Johns. 473; 2 Kent, Comm. 361.

Other judges have concurred in the disposition to give these lien laws a liberal construction, holding them to be beneficial to the general interests of commerce, and having a foundation in national equity. The Calisto [Case No. 2,316]; Weaver v. The S. G. Owens [Id. 17,310]. The highest court of this state, on the contrary, is disposed to hold the law to a rigid construction. The court, in considering a claim to a lien under this statute, say: "It is a privilege granted to certain descriptions of creditors by a specific law in derogation of the common law, and cannot be extended or enlarged by construction." Veltman v. Thompson (July, 1850) 3 Comst. [3 N. Y.] 441.

The interpretation of the statute in relation to facts analogous to those in the present case has also since the decision of this court in the case of The N. P. Tallmadge been made by the supreme court of the state in a judgment apparently well considered, and which does not appear to have been since called in question in the state courts. The facts are not now set out with fullness in the report of the case, but they are distinctly signified in the report of the referees and the judgment of the court. Hubbell attached the schooner Columbus for a debt due him contracted by "the master and builder, owner and contractor," for building her, for work and labor done upon, and materials found for, the schooner, at the request of such owner-builder, etc. The referees reported that the builder for the time being was the master of the vessel, and that the lien attached, etc. Builder was originally a part owner, for it is adjudged that upon his assignment of his interest he stood only in the relation of builder. On appeal to the supreme court, those provisions of the statute were rehearsed, and the court say, the proof is that the builder was not owner, for he had assigned all his interest, and stood in the simple relation of a man hired to build. Upon the facts in evidence, the court also say, it is clear the builder was not agent or consignee or master competent to charge the vessel under the statute, and declared emphatically that the builder is neither within the words, nor the reason, nor equity of the act, and therefore the report of the referees in favor of the lien was set aside. Hubbell v. Denison (October, 1838) 20 Wend. 181.

In the present case, Bishop and Simonson made a contract with the claimants to build the steamship Ohio, furnish the labor and materials, etc., for the sum of $110,000, to be paid in monthly instalments as the work progressed. The payments were fully made by the contractors at the terms stipulated, and when the ship was launched and taken possession of exclusively by the claimants, all due to the builders under that contract had been satisfied. Bishop & Simonson, on these facts, also stood in relation of builders hired to furnish the ship to the claimants, and had no right of ownership in her as against them, at any time, even in equity, except the scintilla of title which might seem in them for the periods intermediate their respective payments. Then both the labor and materials applied to the vessel, being fully paid for, became the property of the claimants. So the parties understood their own relations, for the claimants are specifically named as owners of the ship in the contract with Bishop & Simonson and the contract and all the transactions under it were in concurrence with that relationship between the parties. In Hubbell v. Denison, it is implied that the materials sued for in this case were supplied in part during the progress of the work, and in part before Bishop & Simonson commenced building the ship, on a general account between them and the libellant for timber ordered to their yard. The same course of dealing had subsisted between them many years. The bill alleges that the timber furnished by the libellant under orders commencing at about the time they undertook to build the ship and continuing to the failure of Bishop & Simonson amounted to the sum of $2,973.57, of which there is still due and unpaid $2,159.28. This account is made up of portions of a much larger amount for the same description of timber furnished by the libellant to the ship yards of Bishop & Simonson, and out of which he alleges a quantity equal to this sum was applied to the ship. It however appears by the proofs, that, during the running of the account, he received in cash and merchandise from Bishop & Simonson $3,768.08, a sum very considerably exceeding the value of the timber charged by him against the Ohio. This evidence is

at least conclusive to show, that the libellant has been paid the value of his timber which has gone into the Ohio, although not paid for specifically as such, and although there is a large balance in his favor on general account against Bishop & Simonson. The fact is referred to not to show the difficulty of identifying the quantity of timber used in the Ohio, and apportioning to her the just quota of the whole value, but in connection with the position that the claimants were equitably as well as legally owners of the ship during the progress of her construction, and that Bishop & Simonson had no claim to the character of owners of her at any period of their connection with the libellant or the claimants.

It is proper to remark that Bishop & Simonson being the direct and immediate contractors with the claimants for the timber supplied, they had in themselves no privilege or lien for their demands other than the common-law right to retain possession of the ship until their demands against her were satisfied (Gregory v. Stryker, 2 Denio, 628); and with their claim after giving over possession to the owners (The Etna v. Treat, 15 Ohio, 585), it is doubtful, upon authority, whether the privilege in respect to it would attach to the ship in favor of any remote or secondary party upon the ground that he was the one actually supplying the materials to the contractors. Judge Story, in discussing a claim of kindred character, brought by the employé of an employer, who, under a statute of the state of Maine similar to that of this state, had a lien for his work, says it is difficult to perceive the ground upon which the servant can entitle himself to any lien. Read The Hull of a New Brig [Case No. 11,609]. That case also announces another doctrine adverse to the right of a party to claim in this court a distribution of his services when rendered under a general undertaking, so as to give part of them the benefit of a lien. The libellant was hired as a shipwright generally in the employ of ship builders, and a portion of the time was devoted to working in the vessel attached, and the residue to the current business of his employers. Judge Story decided, that his contract was an entirety, and the court had no authority to apportion it so as to give a lien upon the different things on which his work was done during the period. Id. The case contains another principle applicable to this: That the right of lien arises only when the service or materials for which it is claimed, were rendered or supplied specifically for the ship sought to be charged. Id.

Bishop & Simonson had two large yards in which they built and repaired vessels, and where materials were kept on hand for those purposes, and were transferred from one yard to the other as their business required, and whilst the Ohio was building at one, two other steamers were constructing at the other. They had, for years antecedent the orders to the libellant now under consideration, purchased various kinds of timber of him, which was supplied of the sizes and descriptions called for, without any reference to the uses to which it was to be applied. An account current was kept between them, and it was adjusted by payments as called for, without any designation in such payments of any particular part of the account on which they were made. The account was treated as an entirety, and settled as such from time to time. When Bishop & Simonson were about to fail, they requested the libellant to take back out of their yard a portion of timber then remaining there which they had received from him, and he did so. On their failure, they stood indebted to him on that general account the balance above stated. In a suit by Van Pelt v. The Ohio [Case No. 16,870a], in this court, before Judge Nelson, the judge held, under a similar state of facts, that the credit was given by the libellant to Bishop & Simonson as timber merchants, and had no relation to the ship then building or any other specific use, and dismissed the libel, on the ground that no lien attached to the ship therefor. I in no way dissent from the decision in that case, but in the present I found the decision more on consideration of law arising out of the proper interpretation of the state statute, than on the effect of the direct contract between the parties. I hold that Bishop & Simonson were not owners of the ship. The materials and labor put in her during her construction became the property of the claimants, which Bishop & Simonson could not divest by transferring the ship to another person, nor could they withhold it from them, under any other right or authority than the common-law privilege of lien in their behalf as builders. They were not agents of the owner in their capacity of builders competent to charge the ship, with liens to third parties; nor did they, in any legal sense, possess the rights or authority of a master of the ship to that end. I do not deem it necessary to determine under what circumstances, if any, subcontractors or employés of shipbuilders can acquire liens for their labor or supplies applied to the ship under contract with the builders; but I apprehend it will be difficult to support such lien without some direct sanction of it by the owner or his authorized agent, or notice to the owner that the ship will be charged therefor before the service is rendered or the materials supplied, or at least before payment therefor made by him. The inclination of the court is always against tacit and implied liens. They tend to embarrass the commerce in ships, and entangle bona fide holders in claims and controversies which they are not to be presumed connected, and respecting which they possess no means to compel a disclosure, against those setting them up. The policy of the

law will not look less solicitously to the protection of the rights of a purchaser of a ship without notice of a tacit and implied lien, in favor of workmen and materialmen, than it does to the interests of the latter parties: and the court will take care not so to enlarge the equities of the state statute in behalf of one class of claimants as to do irreparable injustice to another class equally meritorious.

The libel in this case must be dismissed.

[Affirmed on appeal by the circuit court, Case No. 14,322.]

